Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9100 Wilshire Blvd., #725 E.
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL KENT,<br><br>Plaintiff,<br><br>vs.<br><br>GW PHARMACEUTICALS, PLC, GEOFFREY GUY, JUSTIN GOVER, CABOT BROWN, DAVID GRYSKA, CATHERINE MACKEY, JAMES NOBLE, ALICIA SECOR, and LORD WILLIAM WALDEGRAVEA,<br><br>Defendants. | Case No. '21CV0530 MMA AHG<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Michael Kent ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

- 1 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## NATURE OF THE ACTION

1.     Plaintiff brings this action against GW Pharmaceuticals, PLC ("GW" or the "Company") and the members of GW's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  By the Action, Plaintiff seeks to enjoin the vote on a proposed transaction pursuant to which GW will merge with Jazz Pharmaceuticals, PLC ("Jazz") and its subsidiary, Jazz Pharmaceuticals UK Holdings Limited ("BidCo") (the "Proposed Transaction").[1]

2.     On February 3, 2021, GW and Jazz issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Jazz will acquire GW for $220.00 per American Depositary Share (ADS), in the form of $200.00 in cash and $20.00 in Jazz ordinary shares, for a total consideration of $7.2 billion, or $6.7 billion net of GW cash.

3.     On March 15, 2021, 2021, GW filed a DEFM14A Definitive Proxy Statement (the "Definitive Proxy") with the SEC.  The Definitive Proxy, which recommends that GW stockholders vote to approve the Proposed Transaction, omits or misrepresents material information concerning, among other things: (a) the financial projections for GW and Jazz, provided by GW and Jazz to the Company's financial advisors Centerview Partners LLC ("Centerview") and Goldman Sachs & Co. LLC ("Goldman"); (b) the data and inputs underlying the financial valuation analyses provided by Centerview and Goldman; and (c) potential conflicts of interest affecting company management.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and

---

[1] Non-party Jazz is a biopharmaceutical company organized under the laws of the Republic of Ireland and shares of Jazz common stock are traded on the Nasdaq Stock Exchange under the symbol "JAZZ." Non-party Merger Sub is a wholly owned subsidiary of Jazz created to effect the Proposed Transaction.

20(a) of the Exchange Act as GW stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction.

4.  It is imperative that the material information omitted from the Definitive Proxy is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5.  For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to the Company's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6.  This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

7.  The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.  Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company maintains an administrative office located in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

9. Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of GW.

10. Defendant GW is a biopharmaceutical company focused on discovering, developing and commercializing novel therapeutics from its proprietary cannabinoid product platform in a broad range of disease areas. GW is organized under the laws of England and Wales and has its principal place of business at Sovereign House, Vision Park Chivers Way, Histon Cambridge, CB24 9BZ United Kingdom and an administrative office located at 5750 Fleet Street, Suite 200, Carlsbad, California. GW's ADSs are traded on the Nasdaq Stock Exchange under the symbol "GWPH."

11. Defendant Geoffrey Guy ("Guy") has been a Director of the Company at all relevant times. In addition, Guy serves as the Chairman of the Company Board and Founder of the Company.

12. Defendant Justin Gover ("Gover") has been a director of the Company at all relevant times. In addition, Gover serves as the Company's Chief Executive Officer ("CEO").

13. Defendant Cabot Brown ("Brown") has been a director of the Company at all relevant times.

14. Defendant David Gryska ("Gryska") has been a director of the Company at all relevant times.

15. Defendant Catherine Mackey ("Mackey") has been a director of the Company at all relevant times.

16. Defendant James Noble ("Noble") has been a director of the Company at all relevant times. In addition, Noble serves as the Company's Lead Independent Director and Deputy Chairman.

17. Defendant Alicia Secor ("Secor") has been a director of the Company at all relevant times.

18. Defendant William Waldegrave ("Waldegrave") has been a director of the Company at all relevant times.

- 4 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

19.     As noted above, the defendants identified in paragraphs 11-18 are referred to herein as the "Board" or the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

20.     GW is a biopharmaceutical company focused on discovering, developing, and commercializing novel therapeutics from its proprietary cannabinoid product platform in various disease areas. The Company was founded in 1998 and is based in Cambridge, the United Kingdom

21.     Its lead product is Epidiolex, an oral medicine for the treatment of seizures associated with Lennox-Gastaut syndrome, Dravet syndrome, or tuberous sclerosis complex. The company also develops and markets Sativex for the treatment of spasticity due to multiple sclerosis. In addition, it develops various product candidates for the treatment of schizophrenia, autism spectrum disorder, neuropsychiatric symptom, and neonatal hypoxic ischemic encephalopathy.

22.     The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated impressive financial results. For example, in the January 11, 2021 Press Release announcing its 2020 Q4 and full year 2020 operational and financial results, the Company highlighted total net product sales of approximately $148 million for the fourth quarter and approximately $526 million for the year ended December 31, 2020. Total net product sales of Epidiolex were approximately $144 million for the fourth quarter, comprising $129 million in the US and $15 million ex-US. Total net product sales of Epidiolex for the year ended December 31, 2020 are expected to be approximately $510 million compared to $296 million in 2019.

23.     Defendant CEO Gover commented on the positive results in the Press Release, "'Epidiolex sales increased by over 70% in 2020 despite the challenges of COVID-19, reflecting the positive impact this medicine has on patients as well as the performance of our commercial team. We remain encouraged by our patients' experience on this product, as demonstrated by high persistence

and refill rates. This, combined with our expansion of payer coverage and the recently approved Tuberous Sclerosis Complex indication, leads us to expect continued strong growth in 2021 in both the US and Europe... Our goals in 2021 include driving further Epidiolex growth and advancing multiple US pivotal trials for nabiximols in the treatment of MS spasticity, with the first data readout expected this year. In addition to our previously announced pipeline activities, we are leveraging our world leadership in cannabinoid science to design and synthesize novel cannabinoid molecules and expect our first novel product candidate to enter the clinic in 2021.'"

24. On February 3, 2021, GW and Jazz jointly announced in relevant part:

DUBLIN and LONDON, Feb. 3, 2021 /PRNewswire/ -- Jazz Pharmaceuticals plc (Nasdaq: JAZZ) and GW Pharmaceuticals plc (Nasdaq: GWPH) today announced the companies have entered into a definitive agreement for Jazz to acquire GW for $220.00 per American Depositary Share (ADS), in the form of $200.00 in cash and $20.00 in Jazz ordinary shares, for a total consideration of $7.2 billion, or $6.7 billion net of GW cash. The transaction, which has been unanimously approved by the Boards of Directors of both companies, is expected to close in the second quarter of 2021.

Upon close of the transaction, the combined company will be a leader in neuroscience with a global commercial and operational footprint well positioned to maximize the value of its diversified portfolio.

GW is a global leader in discovering, developing, manufacturing and commercializing novel, regulatory approved therapeutics from its proprietary cannabinoid product platform to address a broad range of diseases. The company's lead product, Epidiolex® (cannabidiol) oral solution, is approved in patients one-year and older for the treatment of seizures associated with Lennox-Gastaut Syndrome (LGS), Dravet Syndrome and Tuberous Sclerosis Complex (TSC), all of which are rare diseases characterized by severe early-onset epilepsy. *Epidiolex* was the first plant-derived cannabinoid medicine ever approved by the U.S. Food and Drug Administration (FDA). This product has also been approved, under the tradename Epidyolex®, by the European Medicines Agency (EMA) in patients two years of age and older for the adjunctive treatment of seizures associated with LGS and Dravet syndrome in conjunction with clobazam and is under EMA review for the treatment of seizures associated with TSC. In addition to the approved indications for *Epidiolex*, there are considerable opportunities to pursue other indications within the epilepsy field, including other treatment-resistant epilepsies where significant unmet needs of patients exist.

Beyond *Epidiolex*, GW has a scientific platform and deep innovative pipeline of cannabinoid product candidates, as well as highly specialized manufacturing expertise,

developed over two decades of pioneering and building leadership in cannabinoid science. This pipeline includes nabiximols, for which the company is in Phase 3 trials to seek FDA approval for treatment of spasticity associated with multiple sclerosis and spinal cord injury, as well as earlier-stage cannabinoid product candidates for autism and schizophrenia.

"Jazz is proud of our leadership position in sleep medicines and rapidly growing oncology business. We are excited to add GW's industry-leading cannabinoid platform, innovative pipeline and products, which will strengthen and broaden our neuroscience portfolio, further diversify our revenue and drive sustainable, long-term value creation opportunities," said Bruce Cozadd, chairman and CEO of Jazz Pharmaceuticals. "We are joining two teams that share a passion for, and track record of, developing differentiated therapies that advance science and transform the lives of patients. This will help facilitate a successful integration and bring added capabilities to Jazz. Given the strength of our balance sheet and the meaningful financial drivers of the transaction, we are confident in the value we can deliver to both companies' shareholders and patients. We look forward to welcoming the GW team to Jazz to build an even stronger company."

"Over the last two decades, GW has built an unparalleled global leadership position in cannabinoid science, including the successful launch of Epidiolex, a breakthrough product within the field of epilepsy, and a diverse and robust neuroscience pipeline. We believe that Jazz is an ideal growth partner that is committed to supporting our commercial efforts, as well as ongoing clinical and research programs," said Justin Gover, CEO of GW Pharmaceuticals. "We have a shared vision of developing and commercializing innovative medicines that address significant unmet needs in neuroscience and an approach of putting patients first. Together, we will have an opportunity to reach and impact more patients through a broader portfolio of neuroscience-focused therapies than ever before."

**Creates an Innovative, High-Growth, Global Biopharma Leader with Financial Strength**

- **Adding a Third High-Growth Commercial Franchise:** The transaction enhances product diversification through the addition of a third high-growth commercial franchise for critical unmet patient needs within: 1) sleep disorders, 2) oncology, and 3) epilepsies. Specifically, the acquisition will expand Jazz's growing neuroscience business by adding *Epidiolex*, a global, high-growth childhood-onset epilepsy franchise with near-term blockbuster potential.

  GW has rapidly scaled *Epidiolex*, achieving approximately $510 million in annual sales within two years of launch and broad access to date, with more than 97% of U.S. lives covered[1]. *Epidiolex* addresses significant unmet needs in the field of epilepsy and offers the potential for a substantial improvement in outcomes for patients who were previously drug resistant. The combined company will create a neuroscience leader with a global franchise and complementary therapeutic expertise, to maximize the value of

Xywav™ (calcium, magnesium, potassium, and sodium oxybates) oral solution, *Epidiolex*, and other neuroscience products.

- **Robust Combined Pipeline in Neuroscience and Oncology to Drive Sustainable Growth:** GW's novel cannabinoid platform will expand and diversify Jazz's growing neuroscience pipeline. The collective Jazz and GW teams will bring highly complementary expertise to a pro-forma pipeline of 19 clinical development programs across neuroscience and oncology, including in sleep, epilepsy, movement disorders, psychiatry, hematology and solid tumors. Following the close of the transaction, the combined portfolio will include highly differentiated assets addressing significant unmet patient needs, which, when combined with complementary commercial models, accelerates Jazz's growth strategy.

- **Shared Culture and Exceptional Talent Will Advance Mission to Transform the Lives of Patients:** Jazz and GW are focused on developing life-changing medicines for people with serious diseases, often with limited or no treatment options. Jazz's and GW's global teams possess unique talents and expertise and have proven capability to develop and launch differentiated therapies to support often-overlooked patient populations. Both companies are guided by shared values that include integrity, collaboration, passion, innovation and pursuit of excellence, and have cultures where diversity, equity and inclusion are a priority. The transaction brings together two companies with a significant presence in the United Kingdom, which is expected to remain an important part of the combined enterprise.

- **Expected to Deliver Substantial Shareholder Value:** The combination is expected to provide accelerated double-digit top-line revenue growth and to be accretive in the first full year of combined operations and substantially accretive thereafter. Jazz's strong cash flow profile provides the capability to rapidly deleverage to a target net leverage of less than 3.5x by the end of 2022.

**Transaction Terms**

Under the terms of the agreement, holders of GW ADSs, which each represent 12 GW ordinary shares, will be entitled to receive $220.00 for each GW ADS, of which $200.00 will be paid in cash and $20.00 in Jazz ordinary shares. This represents a premium of approximately 50 percent over GW's closing stock price on February 2, 2021, of $146.25 and 60 percent over GW's 30-day volume weighted average price of $137.17.

The number of Jazz ordinary shares to be issued to the holders of GW ADSs will be based on the volume-weighted average price of Jazz's ordinary shares over a 15 trading day period preceding the closing date of the transaction, subject to limitations on the maximum and minimum number of Jazz ordinary shares issuable per GW ADS based on a price range of $139.72 to $170.76 per Jazz ordinary share. Holders of GW ordinary shares that are not in ADS form will be entitled to receive the foregoing consideration divided by 12 per ordinary share.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The cash portion of the transaction consideration is expected to be funded through a combination of cash on hand and debt financing. Jazz has obtained fully committed debt financing from BofA Securities and J.P. Morgan Securities LLC. The financing includes a meaningful portion of pre-payable debt, in line with Jazz's commitment to rapid deleveraging.

**The Definitive Proxy Misleads GW Stockholders by Omitting Material Information**

25.     Defendants filed a materially incomplete and misleading Definitive Proxy with the SEC and disseminated it to GW's stockholders. The Definitive Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

26.     Specifically, as set forth below, the Registration Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (a) the financial projections for GW and Jazz, including those provided to Centerview and Goldman; (b) the data and inputs underlying the financial valuation analyses provided by Centerview and Goldman; and (c) potential conflicts of interest affecting company management.

*Material Omissions Concerning GW's and Jazz's Financial Projections*

27.     The Definitive Proxy omits material information regarding GW's and Jazz's financial projections.

28.     As an initial matter, the Definitive Proxy omits any financial projections for Jazz.

29.     The Definitive Proxy also omits material information regarding the multiple sets of financial forecasts for GW referenced therein.

30.     In that regard, the Definitive Proxy omits material information regarding the "July Forecasts of GW Management." *See Definitive Proxy* at 83. Specifically, the Definitive Proxy omits the line items underlying GW management's forecasts for both "Total Revenue" and "EBIT." In addition, with regard to the forecasts for Total Revenue, the Definitive Proxy further provides: "The July Forecasts reflect assessments by GW management of the probability of success ("POS") for each

of the products and product candidates in the indications covered by the July Forecasts." *Id.* Nowhere, however, are these underlying assessments, or the POS for each product, disclosed.

31. The Definitive Proxy includes similar omissions related to the "December Forecasts of GW Management." *See id.* at 84. As with the preceding set of forecasts, the Definitive Proxy states that GW management's projections for December "reflect assessments by GW management of the POS for each of the products and product candidates in the indications covered by the December Forecasts." *Id.* Again, however, the Definitive Proxy omits both the underling assessments and POS for each product. And, as with the earlier forecasts, this later set of projections does not include any of the material, underlying line items for either "Total Revenue" or "EBIT."

32. A cursory review of these two sets of projections reveals that GW's management significantly downgraded the Company's projected future performance. The Definitive Proxy is silent, however, on the reasons as to why the Company's fortunes took such a negative turn in such a short period of time. This information must also be disclosed so stockholder can determine whether the Board and the Company's financial advisors utilized the most realistic projections of the Company, and not more pessimistic management projections to justify the Board's financial advisors' fairness opinions and subsequent approval of the Merger Agreement.

33. In that regard, Definitive Proxy also discloses the Company's forecasts for "Unlevered Free Cash Flows" for the period 2021 through and including 2035. *See* Definitive Proxy at 85. The Definitive Proxy omits all underlying line items for these forecasts, including depreciation and amortization, taxes, capital expenditures and changes in net working capital. These must also be disclosed for stockholders to be able to fairly evaluate the Proposed Transaction, as financial forecasts comprise some of the most important information available to stockholders in making such an election.

34.     Notwithstanding that the Definitive Proxy Statement describes Centerview's and Goldman's respective fairness opinions and the various valuation analyses each performed in support thereof, it fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, GW's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on these financial advisors' fairness opinions in determining whether to vote in favor of the Proposed Transaction.

35.     First, the Definitive Proxy omits significant, material information regarding Centerview's financial analyses. For example, the Definitive Proxy omits both the total values and closing dates of each of the selected transactions utilized in connection with Centerview's *Selected Transactions Analysis.*

36.     Next, the Definitive Proxy omits material information regarding Centerview's *Discounted Cash Flow Analysis.* Specifically, the Definitive Proxy fails to disclose: (a) the individual inputs and assumptions underlying the discount rates used in the analysis; (b) quantification of the terminal values of the Company used; (c) the basis to assume unlevered free cash flows would decline in perpetuity after December 31, 2035 at a range of rates of free cash flow decline of 10% to 40% year over year; and (d) the number of fully diluted outstanding GW ADS-equivalent ordinary shares. As mentioned above, the Definitive Proxy also fails to include the line items underlying the unlevered free cash flow forecasts used in connection with this analysis.

37.     The Definitive Proxy next omits the assumptions with respect to Epidiolex and Nabiximols as used in Centerview's *Sensitivity Analysis*.

38.     In addition, with respect to Centerview's *Analyst Price Target Analysis*, the Definitive Proxy fails to disclose: (a) the individual price targets utilized for purposes of the analysis; and (b) the sources of those price targets.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39. Similarly, the Definitive Proxy, fails to disclose the premiums paid in the transactions observed in Centerview's *Premia Paid Analysis*.

40. The Definitive Proxy suffers from material omissions regarding the discussion of Goldman's financial analyses as well. For example, the Definitive Proxy also fails to include material information regarding Goldman's *Discounted Cash Flow Analysis*. These omissions include (a) the individual inputs and assumptions underlying the perpetuity growth rates and discount rates used in the analysis; (iii) quantification of the terminal values of the Company used; and (iv) the number of fully diluted outstanding GW ADS-equivalent ordinary shares. The line items underlying the unlevered free cash flow forecasts used in connection with this analysis are also again omitted.

41. With respect to Goldman's Illustrative *Sum-of-the-Parts Discounted Cash Flow Analysis*, the Definitive Proxy Statement fails to disclose: (a) the individual inputs and assumptions underlying the discount rates utilized in the analysis; (b) quantification of the terminal values; (c) the number of fully diluted outstanding GW ADS-equivalent ordinary shares; and (d) the line items underlying the Company's unlevered free cash flow forecasts.

42. The omission of this information renders certain portions of the Proxy materially misleading, including, *inter alia*, the following section of the Proxy: "Opinion of Financial Advisors of GW."

43. The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Definitive Proxy. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of GW will be unable to make an informed voting decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

- 12 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

44. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

**CLAIMS FOR RELIEF**

**COUNT I**

**Claims Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

45. Plaintiff repeats all previous allegations as if set forth in full.

46. During the relevant period, defendants disseminated the false and misleading Definitive Proxy specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

47. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Definitive Proxy. The Proxy Definitive was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about GW's and Jazz's financial projections and the financial analyses performed by Centerview and Goldman. The defendants were at least negligent in filing the Definitive Proxy with these materially false and misleading statements.

48. The omissions and false and misleading statements in the Definitive Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

49. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

50. Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# COUNT II

**Claims Against the Individual Defendants for Violations of
Section 20(a) of the Exchange Act**

51.     Plaintiff repeats all previous allegations as if set forth in full.

52.     The Individual Defendants acted as controlling persons of GW within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of GW, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Definitive Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Definitive Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Definitive Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Definitive Proxy.

55.     In addition, as the Definitive Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, GW's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of GW, and against defendants, as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.     Directing the Individual Defendants to disseminate an S-4 that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 26, 2021

OF COUNSEL:

**LONG LAW, LLC**
Brian D. Long
3828 Kennett Pike, Suite 208
Wilmington, DE 19807
Tel.: (302) 729-9100
bdlong@longlawde.com

**WEISSLAW LLP**
Joel E. Elkins

By: */s/ Joel E. Elkins*

Joel E. Elkins
9100 Wilshire Blvd., #725 E.
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348
    -and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010

*Attorneys for Plaintiff*